Minute Order Form (06/97)



# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3686 | **DATE** | 9/30/03 |
| **CASE TITLE** | Esposito vs. City of Naperville | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth on the attached Memorandum Opinion and Order, the Court grants defendants' motion for summary judgment on the age discrimination claim (24). The Court dismisses Esposito's state law claims without prejudice. The defendants' motion to strike Esposito's Local Rule 56.1 statement is terminated as moot (28). Judgment is entered in favor of the defendants on Count 1 and dismissing Counts 2 through 5 pursuant to 28 U.S.C § 1367(c)(3). The trial date of 1/5/04 is vacated.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | | number of notices | |
| | Notices mailed by judge's staff. | | | OCT 0 6 2003 | |
| | Notified counsel by telephone. | | | date docketed | |
| ✓ | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | | docketing deputy initials | 34 |
| | Copy to judge/magistrate judge. | | | | |
| OR | courtroom deputy's initials | | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES V. ESPOSITO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 02 C 3686 |
| ) | |
| CITY OF NAPERVILLE, ) | |
| ROBERT MARSHALL, GARY BOLT, ) | |
| and DAVID PASTRICK, ) | |
| ) | **DOCKETED** |
| Defendants. ) | OCT 0 6 2003 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiff James Esposito sued his former employer the City of Naperville, alleging the Naperville Police Department ("NPD") fired him in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* Esposito also filed state law claims of defamation and false light invasion of privacy against Captain Robert Marshall, Lieutenant Gary Bolt and Officer David Pastrick of the NPD. The defendants have moved for summary judgment on all of Esposito's claims. For the reasons stated herein, the Court grants the defendants' motion for summary judgment on the age discrimination claim but declines to exercise supplemental jurisdiction over the state law claims and dismisses those claims without prejudice.

### Factual Background

Esposito served as a Chicago police officer from April 19, 1965 until he retired from the force on July 15, 1998. Pl.'s Dep. at 14. Esposito and his wife moved to Naperville, and the

1

NPD hired Esposito as a 911 Telecommunicator in December 2000. Def.'s Facts ¶ 16. Esposito did not feel he had the typing skills required for the job and resigned his position on March 8, 2001 in hopes of getting a job as a community service officer ("CSO") for the city. *Id.* ¶ 18. The Naperville Park District hired him in May 2001 as a park district police officer. *Id.* ¶ 14. The NPD hired Esposito as a CSO in July when he was 60 years old. *Id.* ¶¶ 25-26. Esposito worked as a community service officer Monday through Friday and as a park district police officer on the weekends. Pl.'s Dep. at 123. As a CSO, Esposito assisted police officers with non-criminal matters and staffed the police station's front desk. Def.'s Facts ¶ 21. As a park district officer, he patrolled the city's parks and beaches. Pl.'s Dep. at 102.

While Esposito was patrolling a park on Sunday, June 24, 2001, he heard an NPD call over his radio regarding a fight taking place a few blocks away. *Id.* at 101-03. He decided to go to the scene in case the NPD needed assistance. *Id.* at 103. By the time he got to the scene, five police cars had arrived. *Id.* at 104. Esposito got out of his car, realized the fight between two African-American women had been quelled, and left. *Id.* at 106. Pastrick was one of the Naperville police officers at the scene. Def.'s Facts ¶ 64. Pastrick reported to Sergeant Brian Cunningham that before leaving the scene, Esposito had said, "I can't believe these fucking niggers." *Id.* ¶ 65. In response to Pastrick's report, Esposito gave a statement to his supervisor at the park district, saying:

> On the date and time in question the reporting officer was accused by a Naperville P.O. of making a racial remark. This is not true. What the R/O said was "I can't believe that I moved here from Chicago to get away from dogasses and here they are in Naperville. There were many people . . . name calling and swearing but the R/O was not one of them. The Naperville [sic] could have heard the remark but it did not come from me.

Def. Ex. H. In his recent deposition, Esposito denied making any comment at all. Pl.'s Dep. at 107-08. But he added that if he did say something, he would have used the term "dogass or pooch," which, he explained, are terms used by Chicago police without reference to gender or race. *Id.* at 96. Despite Esposito's denials, on June 25 Cunningham wrote a memorandum to Bolt about Pastrick's account of what Esposito had said. Def.'s Facts ¶ 68. Either Marshall and/or Bolt gave the memo to Deputy Chief Scheutz of the park district. *Id.* ¶ 69. For the time being, nothing else came of the alleged comments.

When Esposito joined the NPD as a CSO the following month, he was placed on probation because city policy requires "[a]ll new hires . . . serve at least a six-month initial probationary period . . . . During that period, an employee who does not perform to expectations may be terminated." *Id.* ¶ 29. At the time Esposito was hired, the city had ten other CSOs, five of whom were more than 50 years old: (1) James Vergos was 69; (2) Gerald Stoj was 65; (3) Paul Cegles was 59; (4) Dennis Senziol was 54; and (5) Joyce Everson was 52. *Id.* ¶ 31. Esposito was assigned to work at the front desk of the police station "because his past experience as a City of Chicago police officer best suited him for such duties." *Id.* ¶ 23.

While Esposito was working at the front desk on September 25, 2001, he received a call from Rebecca Furmanski, reporting that her wallet had been stolen at the Holiday Inn Select in Naperville. *Id.* ¶¶ 32, 34. Furmanski says that Esposito told her, "Between you and me, there's a lot of Mexicans working there." Furmanski Aff. ¶ 2. Furmanski then told Esposito that unauthorized charges had already been made on her credit cards in Aurora, and, she says, Esposito responded, "There's a lot of Mexicans in Aurora, too." *Id.* Furmanski put Esposito on hold while she talked to her father, and when she

3

> resumed [her] conversation with Officer Esposito, [she] said to him that his name, "Esposito," sounded like an Hispanic name, to which he replied: "Oh no, *I'm* not one of those spics." To this comment [she] responded: "Well, *I* am. My full name is Rebecca Hernandez Furmanski. I'm Hispanic–actually, I'm 100% Mexican." [She] told Officer Esposito that [she] did not appreciate his comments and asked to speak with his supervisor to complain about his conduct.

*Id.* Furmanski says that Esposito told her there were no supervisors in the building and that she could call back later on her own. *Id.* Furmanski says she called back immediately to complain; the dispatcher connected her to the front desk again, and Esposito answered the call. *Id.*

> During this second, much shorter, conversation Officer Esposito indicated that [sic] had not realized that [she] was Mexican–that [she] did not speak with an accent. [She] asked him whether if [she] had an accent, he would treat [her] differently? He did not respond, but went on to say that he also knew from the police report [she] had made that [she] lived in Geneva, to which [she] responded: "So you don't think any Mexicans live in Geneva?" At that point, Officer Esposito abruptly terminated his conversation with [her].

*Id.* Furmanski called back a third time and asked that she not be transferred to Esposito. *Id.* ¶ 3. The radio dispatcher took a message. Shortly thereafter a sergeant returned her call, and she made a formal complaint. *Id.*

After his conversation with Furmanski, Esposito told the officer with whom he was working that Furmanski might file a complaint. Pl.'s Dep. at 118. But Esposito decided not to tell his supervisor about what happened, figuring Furmanski might not report the incident. Pl.'s Dep. at 115. But Furmanski did make a complaint, and the next day the NPD's internal affairs unit began an investigation. Def.'s Facts ¶ 54. Esposito was suspended with pay. *Id.* ¶ 55.

On September 27, Esposito met with Police Chief David Dial to give his side of the story. *Id.* ¶ 70-71. Esposito denied using the term "Mexican." Pl.'s Dep. at 74-75. He said that he told Furmanski: "Aurora has a large Hispanic population. There is a large Hispanic work force at

4

that Holiday Inn. I see a connection." *Id.* at 74. Esposito said he was "just trying to help her retrieve her property" and "[was] not trying to insult anybody." *Id.* at 77. But he said he thought she might complain because she had told him "I am full-blooded Mexican-American" and had asked for a supervisor before hanging up. *Id.* at 118. Dial also asked Esposito about Pastrick's report of his comments at the June fight. Def.'s Facts ¶ 71. Dial concluded that "Esposito's only real dispute with Ms. Furmanski's account of his contact with her was that he claimed to have used the word 'Hispanic' instead of the word 'Mexican,' a distinction that was not determinative of whether or not the comments CSO Esposito made were grossly inappropriate, and which indicated to [Dial] that he had no understanding of the nature of his wrongdoing." Dial Aff. ¶ 7. Dial told Esposito that he had either resign or he would be fired. Def.'s Facts ¶ 73. Esposito decided to resign. *Id.* ¶ 76. Dial wrote a letter of apology to Furmanski, explaining that the department's "investigation disclosed that the comments made by this employee were insulting and not consistent with the policies of the Naperville Police Department or our expectations of our employees." Dial Aff. Ex. C. The letter went on to say that Dial had accepted Esposito's resignation and "regret[ted] the statements made by that employee and ha[d] taken the necessary steps to ensure that it does not recur." *Id.*

Shortly after Esposito resigned from the police department, his supervisor at the park district told him that he "pissed off a lot of people" at the police department and was "no longer an asset but a liability" and that his time as a park district officer was done. Pl.'s Dep. at 125. But Esposito's suit appears only to complain of his constructive termination by the NPD. Esposito filed a complaint with the EEOC on Feb. 12, 2002, receiving a Notice of Right to Sue, a copy of which was served on the city, on Feb. 25, 2002. Pl.'s Resp. at 4. On April 23, 2002, the

5

police department hired Allen Dennen, then 59, as a CSO. Def.'s Facts ¶ 79.

**Analysis**

The defendants move for summary judgment on all of Esposito's claims. Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court evaluates admissible evidence in the record in the light most favorable to the nonmoving party. *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002). But "[t]he nonmovant will successfully oppose summary judgment only when it presents 'definite, competent evidence to rebut the motion.'" *Vukadinovich v. Bd. of Sch. Tr. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002) (citation omitted). "The mere denial of a particular fact without specific references to affidavits, parts of the record, and other supporting materials is insufficient, and, where a properly supported factual assertion is met with such a naked denial, the fact may be deemed admitted." *Fuller v. Caterpillar Inc.*, 124 F. Supp. 2d 610, 614 (N.D. Ill. 2000).

1.  **Age discrimination claim**

The City of Naperville argues Esposito can neither make out a prima facie case of age discrimination nor rebut the NPD's legitimate and nondiscriminatory reason for asking him to resign. "In the employment discrimination context, summary judgment is warranted where the evidence, interpreted favorably to the plaintiff, could not persuade a reasonable jury that the employer had discriminated against the plaintiff." *Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 739-40 (7th Cir. 2002) (citations and internal quotation marks omitted). The Court concludes that even if Esposito's account of the Furmanski conversation and June 24 remarks are true,

6

Naperville is entitled to summary judgment because no reasonable jury could doubt that the NPD asked Esposito to resign because of these two incidents.

Admittedly lacking evidence of direct discrimination, Esposito attempts to establish a prima facie case of discrimination using the *McDonnell Douglas* method. Pl.'s Resp. at 3. To establish a prima facie case under the *McDonnell Douglas* approach, Esposito must show that "(1) [he] is a member of the protected class (in an ADEA case, employees over 40 years of age, *see* 29 U.S.C. § 631(a)); (2) [he] was performing at a satisfactory level; (3) [he] was subject to an adverse employment action; and (4) [he] was treated less favorably than younger, similarly situated employees." *Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 574 (7th Cir. 2003). However "[w]hen the defendant has proffered an explanation for termination that the court determines to be non-pretextual, the court may avoid deciding whether the plaintiff has met his prima facie case and instead decide to dismiss the claim because there is no showing of pretext." *Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir. 1998) (citation omitted). This is commonly done when, as here, the defendant's argument for why the plaintiff cannot make out a prima facie case is the same as its proffered reason for firing the plaintiff: the plaintiff performed his job unsatisfactorily. *Jones*, 302 F.3d at 742. Because there is no evidence from which a jury reasonably could find that the city's proffered non-discriminatory reason for asking Esposito to retire was pretextual, the Court need not determine whether Esposito has established a prima facie case.

Naperville has stated that Dial asked Esposito to resign because of the Furmanski

complaint and the alleged June 24 racial slur.[1] Once the city has offered a non-discriminatory reason for asking Esposito to resign, the burden of proof shifts to Esposito to show that the reason is pretextual. Esposito has provided no evidence from which a jury reasonably could infer that Dial did not base his decision on the two alleged incidents of racially insensitive comments. Esposito offers three arguments for why the city's stated reason should not be believed. None are persuasive.

First, Esposito argues that Pastrick's allegation that he used a derogatory term on June 24 was false and his comments to Furmanski were innocuous. Pl.'s Resp. at 6-7. But it is not material whether Dial's understanding of the incidents was accurate: "[A]rguing about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are *right* but whether the employer's description of its reasons is *honest*." *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997) (emphasis in original; citations and internal question marks omitted). As long as Dial believed that the incidents had occurred, his reliance on the two events is not pretextual just because they may have been misrepresented to him. "[I]f the [defendant] honestly believed in those reasons, the plaintiff loses even if the reasons are foolish or trivial or baseless." *Id.* at 676 (citation omitted). Esposito has offered no evidence to suggest that Dial did not believe that Esposito had made racially insensitive comments. In fact, Esposito's own testimony confirms that Dial's assumption was correct as to at least the Furmanski conversation; Esposito admits that he had

---

[1] Esposito argues that the city has failed to state a reason why Esposito was asked to resign. Pl.'s Resp. at 1-2, 3, 5 and 6. But it is apparent to the Court from Dial's affidavit and the defendants' memorandum in support of their motion for summary judgment and statement of material facts that Dial's stated reason for asking Esposito to resign was the alleged racially insensitive comments. *See* Def.'s Memo at 3, 5; Def.'s Facts ¶¶ 70-76; and Dial Aff. ¶¶ 2-8.

8

suggested that the crime might have been committed by Hispanics because there were many in the area. Even if Dial might be claimed to have acted unreasonably in asking Esposito to resign after only one confirmed incident of racially-biased remarks, Esposito cannot show the Furmanski incident was not the reason he was asked to resign. *See Flores v. Preferred Technical Group*, 182 F.3d 512, 516 (7th Cir. 1999) ("[T]he employer only needs to supply an honest reason, not necessarily a reasonable one.")

Second, Esposito says that if he were younger, the NPD would have given him a second chance after the Furmanski complaint. Pl.'s Dep. at 88; Pl.'s Resp. at 7. But Esposito offers no evidence to substantiate his claim. He does not provide a single example of a CSO who was the subject of a citizen complaint of racial insensitivity or similar conduct and was given a warning rather than the option of resignation or termination.

Esposito's third challenge to the NPD's proffered reason for his constructive termination is that the higher-ups at the NPD did not like that younger officers sought advice from Esposito, a retired Chicago police officer.[2] Pl.'s Resp. at 7. In support of his claim, Esposito attaches an affidavit in which he offers his own opinion that the higher-ups did not like younger officers seeking his advice. Pl.'s Ex. B ¶¶ 3-4. This type of conjecture–even when in the form of an affidavit–does not constitute the type of evidence that creates a genuine issue of fact. *Abioye*, 164 F.3d at 368 (citations omitted). And even if Esposito were able to offer evidence in support of his theory, the fact that supervisors in the NPD did not like younger officers looking up to

---

[2] Esposito first raised this claim in an affidavit he signed more than a month after his deposition. *See* Pl.'s Ex. B. The defendants have filed a motion to strike the affidavit, arguing Esposito cannot supplement his deposition testimony in this manner. Def.'s Mot. to Strike. Because the Court grants the defendants' motion for summary judgment on the ADEA claim, the motion to strike is dismissed as moot.

9

Esposito does not suggest that he was asked to resign for any reason other than the alleged incidents of racial insensitivity. In sum, because Esposito has not rebutted the city's claim that the NPD fired Esposito for making racially insensitive remarks, the Court grants the defendants' motion for summary judgment on the age discrimination claim.

**2.    State law claims**

Esposito has filed state law claims of defamation and false light invasion of privacy against Marshall, Bolt and Pastrick for alleging that Esposito made a racial slur on June 24 and disseminating the allegation. The defendants argue they are entitled to summary judgment on these claims because their actions are privileged and protected under Section 2-201 of the Local Governmental and Governmental Employees Tort Immunity Act. A federal court may, at its discretion, decline to exercise supplemental jurisdiction over state law claims that remain after dismissal of the claim over which the court originally had subject-matter jurisdiction. 28 U.S.C. § 1367(c)(3). The Court declines to exercise supplemental jurisdiction over Esposito's state law claims because the applicability of the Tort Immunity Act and absolute privilege to these defendants is best left to a state court to determine. The Court therefore dismisses Esposito's state law claims for lack of supplemental jurisdiction.

## Conclusion

For the reasons stated above, the Court grants defendants' motion for summary judgment on the age discrimination claim [docket # 24]. The Court dismisses Esposito's state law claims without prejudice. The defendants' motion to strike Esposito's Local Rule 56.1 statement is terminated as moot [docket # 28]. The Clerk is directed to enter judgment in favor of the defendants on Count 1 and dismissing Counts 2 through 5 pursuant to 28 U.S.C. § 1367(c)(3).

The trial date of January 5, 2004, is vacated.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: September 30, 2003

11